**W. B. DUNAVANT AND COMPANY,**
Appellant,

v.

**SOUTHMOST GROWERS, INC.,**
Appellee.

**No. 1236.**

Court of Civil Appeals of Texas,
Corpus Christi.

Jan. 19, 1978.

Rehearing Denied Feb. 9, 1978.

Richard D. Davis, Johnson & Davis, Harlingen, for appellant.

Thomas G. Sharpe, Jr., Brownsville, for appellee.

## OPINION

BISSETT, Justice.

This is a suit to recover damages for an alleged breach of a written contract to deliver cotton. W. B. Dunavant and Company, a Texas Corporation, hereinafter called "Dunavant" sued Southmost Growers, Inc., also a Texas Corporation, hereinafter referred to as "Southmost", in the District Court of Cameron County, Texas, for damages caused by Southmost's failure to deliver to it the cotton produced by one Frank Otsuki from a 535 acre allotment that allegedly was included in a written contract between Southmost, as "Seller", and Dunavant, as "Buyer". Trial was to a jury. All of the special issues submitted were answered favorably to Southmost. Motions for judgment non obstante veredicto and to disregard the answers of the jury to certain special issues were timely filed by Dunavant, which were overruled by the trial court. A take nothing judgment against Dunavant was signed on January 28, 1977. Dunavant has timely perfected an appeal from the judgment.

Two questions are presented for resolution. Did Southmost contract to sell to Dunavant all of the cotton which was produced by Otsuki in 1973 from the 535 acres? If so, what is the measure of damages for Southmost's failure to deliver such cotton to Dunavant?

In 1973, Dunavant was a cotton buyer, and Southmost operated a cotton gin in Los Fresnos, Texas. H. R. Hill was Gin Manager for the cotton gin and was also General Manager for Southmost.

The Board of Directors of Southmost met on March 13, 1973. A number of the Directors as well as other farmers who were stockholders of Southmost were present at that meeting, including Mr. Frank Otsuki, a farmer and a Director of Southmost. The matter of selling the 1973 cotton crop on an advance sale and purchase contract was discussed. Hill testified at the trial that he told those in attendance at the meeting that one of the large cotton growers in the area, who could not attend the meeting, wanted to sell his 1973 cotton production at a price of 35.5 cents per pound of lint cotton. Hill further testified:

"And after the discussion it was my impression that everyone then agreed to that, and I recorded that in the minutes. Now, I could have been wrong but that was my impression."

The next day (March 14, 1973) Hill received a telephone call from Mr. George Bennett, who, on behalf of Dunavant, offered to pay 35.5 cents per pound for 1973 cotton. Hill, in response to an inquiry by Bennett as to how many acres would be available for purchase, advised Bennett:

"I believe we will have somewhere around 4,500 acres".

Later during the day, Hill telephoned Bennett and told him:

"We would sell".

Dunavant then prepared a contract in duplicate, signed both copies, and sent them to Southmost. The contract is dated March 16, 1973. As received by Southmost, it consisted of a single printed page with several blank spaces appearing therein. It provided that Southmost would sell to Dunavant all of the 1973 cotton production from "approximately 4500 acres" in Cameron County, Texas, at 35.5 cents per pound. Upon receipt of the duplicate copies of the contract, Hill, in his own handwriting, added the words "attached list 5,347 acres" in one of the blank spaces, and attached a one-page document, which contained the names of fourteen cotton growers and the acreage planted by each to cotton in 1973, to the contract. Hill then signed the contract "Southmost Growers Inc. by H. R. Hill, Mgr" and returned an executed copy, together with the attachment thereto, to Dunavant.

The one-page document, which Hill attached to the printed contract, was prepared by Hill. The following words appear at the very top of the document:

"I OR WE OFFER FOR SALE AND/OR AUTHORIZE SOUTHMOST GROWERS, INC. TO CONTRACT FOR THE SALE OF COTTON PRODUCED BY ME/US DURING THE 1973 GROWING SEASON, AT THE ACREAGES AND CONDITIONS STIPULATED HEREIN:"

One of the stipulated conditions therein was that the cotton was to be sold for 35.5 cents per pound. The attached document was signed by twelve of the fourteen growers therein named, either in proper person or by someone whose authority to sign for them was not questioned by any of the twelve farmers. The total acreage planted to cotton by the fourteen growers was 5,347 acres. The two growers who did not sign the document either in proper person or by duly authorized representative were Jose Almaraz, who was shown to have planted 150 acres in cotton, and Otsuki, who, according to the document, had planted 535

acres in cotton. However, their names were signed in the spaces provided for signatures "by H. R. Hill, Gin Mgr." Hill, by way of explanation of his actions, testified:

"Frank (Otsuki) had been at the meeting, and I thought that—I was under the impression that at that time he had meant to sell his, too. So, in order to get this list on back to them (Dunavant) . . . I signed their names by me and sent it on back to them."

Alvaraz delivered all of the cotton produced by him in 1973 to Dunavant and was paid the contract price of 35.5 cents therefor. Otsuki, however, refused to sell or deliver to Dunavant any of the cotton produced by him in 1973 from his 535 acres at 35.5 cents per pound. His position was that he did not authorize Southmost to sell his 1973 cotton production to anyone for 35.5 cents per pound, and did not authorize Hill to sign his name to the document. On September 25, 1973, he sold all of such production (263,420 pounds of lint cotton) to Dunavant at 65 cents per pound. Thereafter, suit was filed by Dunavant against Southmost to recover damages in the sum of $77,708.90, the difference between the reasonable value of the Otsuki cotton in Cameron County, Texas, at the time of harvest and the contract price.

Seven special issues were submitted to the jury. No one objected to the submission of those issues and no one requested the submission of any additional issues. The jury found: Southmost, by signing the contract, agreed to sell to Dunavant, and Dunavant, by signing the contract, agreed to buy from Southmost "all of the cotton produced from certain acreage during the crop year 1973" (Nos. 1 and 2); the number of acres of cotton contracted for was "4,812 acres" (No. 3); Southmost did not fail to deliver to Dunavant cotton "produced from the acreage included in the contract" (No. 4); the reasonable price per pound for cotton on September 25, 1973 was "65¢ per lb." (No. 5); Southmost did not represent to Dunavant that it "had authority to sell all of the production from 535 acres of cotton grown by Frank Otsuki during the crop

year 1973" (No. 6); and, Southmost did not have "any authority to sell the cotton of Frank Otsuki on or about March 16, 1973" (No. 7).

In May of 1973, Hill heard rumors that Otsuki had not sold his cotton under the contract. He looked at his copy of the contract and discovered that Otsuki had not signed the document which was attached by Hill to the contract originally sent to him by Dunavant. He called Bennett for a copy of Dunavant's copy, which was sent to him. Upon receiving Dunavant's copy, Hill then remembered that he had signed Otsuki's name to the document which he attached to Dunavant's copy. He then called Bennett and told him that he (Hill) did not "think we will have any trouble because Frank (Otsuki) was at the meeting when they agreed to sell it." However, Hill did not discuss the matter with Otsuki at that time.

Otsuki, by letter dated June 26, 1973, advised Dunavant:

". . . [I] was recently advised that you were under the impression that I had sold to you through Southmost Growers, Inc., cotton produced by me on approximately 530 acres of land in Cameron County, Texas.

I have at no time executed any Contract of Sale to sell cotton to you, nor have I authorized my signature on any Contract of Sale for this cotton. Mr. Ross Hill of Southmost Growers, Inc., has recently advised Mr. George Bennett of your company of these facts. . . ."

In late July, 1973, Hill received a telephone call from Bennett saying that Otsuki was trying to sell his cotton "up . . . in Harlingen". By that time cotton was selling from 60 to 70 cents a pound. Hill contacted Otsuki, who told him that he had not sold his cotton. Hill reported this to Bennett.

Hill, at the request of Otsuki, wrote a letter addressed "TO WHOM IT MAY CONCERN". This letter bears the date of May 26, 1973, but Hill, when a copy thereof was introduced in evidence at the trial, testified that he wrote and signed the letter on or about July 26, 1973, and not on May 26, 1973. The letter reads:

". . . TO WHOM IT MAY CONCERN:

This letter is to confirm the fact that Frank Otsuki did not at any time authorize me to sign his name to that offer or contract dated March 9, 1973, selling his cotton to W. B. Dunavant & Company. I was mistaken in assuming that Frank had agreed to sell his cotton to W. B. Dunavant & Company, and a review of the minutes of Southmost Growers Inc., does not show that Mr. Otsuki had agreed in any meeting to sell the cotton to W. B. Dunavant & Company.

Yours very truly,
/S/ H. R. Hill
ROSS HILL"

The minutes of the meeting of March 13, 1973 by Southmost's Board of Directors, which were introduced in evidence stated, in substance, that "all present" agreed to sell their 1973 cotton for 35.5 cents per pound. As already noted, Otsuki was present at that meeting.

Mr. W. B. Dunavant, of the Dunavant Corporation, then arranged a meeting with Hill and several of the Directors of Southmost. He asked them if they could make Otsuki deliver the cotton to Dunavant. The Directors told Dunavant that there was not anything that Southmost could do about the matter. Thereafter, Dunavant commenced negotiations with Otsuki for the purchase of the cotton produced by him in 1973 from his 535 acres. Such cotton was sold by Otsuki to Dunavant on September 25, 1973 for 65 cents per pound of lint cotton.

Dunavant contends in point 1 that the trial court erred in rendering judgment for Southmost, when the undisputed and uncontradicted evidence showed: a) Southmost represented that it had authority to sell Otsuki's cotton; b) Southmost made such representation in a written contract with Dunavant; c) Southmost failed to deliver Otsuki's cotton under the contract. Dunavant further contends that the trial court erred in failing to sustain its motion for judgment non obstante veredicto (point 3) and in failing to disregard the jury's

answers to Special Issues 3, 4 and 6, (point 4) because the undisputed and uncontradicted evidence showed that Southmost: a) represented to Dunavant that it had authority to sell Otsuki's cotton; b) contracted to sell Otsuki's cotton to Dunavant; c) failed to deliver Otsuki's cotton; and d) failure to deliver Otsuki's cotton damaged Dunavant in the amount of $77,708.90. The jury's answer to Special Issue No. 4, wherein it was found that Southmost did not fail to deliver any cotton covered by the contract, is attacked in point 5 on the ground that there is "no evidence" to support such answer.

Southmost contends that Dunavant did not sustain its burden of proof on the contract in question, and the trial court did not err in rendering a take nothing judgment against Dunavant. It argues:

"The testimony established that Dunavant tendered no consideration for the cotton prior to the harvest, that Dunavant changed the contract without Southmost agreeing to it, and that all acreage included in the contract was approximate."

It is settled law in this State that a written contract may comprise multiple documents, and in such case all documents are to be construed as if they were contained in a single instrument, *Braniff Inv. Co. v. Robertson*, 124 Tex. 524, 81 S.W.2d 45 (Tex.Com.App. 1935, opinion adopted); *Travelers Ins. Co. v. Anderson*, 89 S.W.2d 428 (Tex.Civ.App.—Waco 1936, writ ref'd). Here, the contract consisted of: 1) the original printed contract, which was prepared and signed by Dunavant's duly authorized representative; and 2) the one page list of cotton growers and the amount of acres planted by each in cotton for the 1973 crop year, which was prepared by Hill and attached by him to the printed contract. We hold that both documents constituted the contract in question and consider the contract as if both documents were incorporated in a single instrument.

Where a corporation transacts its business by, through or under a general manager, the conduct of such business by the general manager binds the corporation, if the transaction under scrutiny is within the scope of the corporation's business. "The general manager of a corporation occupies the position of a general agent. As a corporation can only act through its agents, the general manager, or general agent, is virtually the corporation itself." *Sealy Oil Mill & Mfg. Co. v. Bishop Mfg. Co.*, 235 S.W. 850, 852 (Tex.Com.App. 1921, opinion adopted). Thus, in the ordinary business affairs of a corporation, as a general rule, the acts of a corporation's general manager are the acts of the corporation itself. *Helms v. Home Owners' Loan Corporation*, 129 Tex. 121, 103 S.W.2d 128 (1937). In the instant case, there is no question but that Hill was the general manager of Southmost, and he, by virtue of such position, was fully empowered and authorized to execute the contract in question on behalf of Southmost. The sale of the cotton from the acreage covered by the contract was within the scope of Southmost's business. The authority of Hill to bind Southmost by his signing the contract as general manager is not challenged in this appeal. There is no contention that the sale by Southmost of the cotton produced from the acreage described in the document which was attached to the original contract sent to Southmost by Dunavant was without the scope of Southmost's business.

It is undisputed: 1) Hill, a day or so prior to March 16, 1973, represented to Bennett that Southmost would sell to Dunavant all of the cotton produced from an estimated 4,500 acres in Cameron County, Texas at 35.5 cents per pound; 2) Dunavant agreed to buy such cotton at the price represented and prepared and sent a printed contract, duly signed by its authorized representative, to Hill, the general manager for Southmost; 3) Hill attached a typewritten list, which contained the names of fourteen cotton producers and the acreage planted in cotton by each for the 1973 crop year, to the original contract, and wrote in his own handwriting on the original contract the words "attached list 5,347 acres"; 4) Hill then signed the contract and sent Dunavant

a signed copy thereof; 5) Dunavant then changed the figure "4,500 acres" to "5,347 acres" on its copy thereof, which change, in effect, enlarged the estimated acreage to a fixed acreage, as reflected by the attachment by Hill to the original contract; and 6) Otsuki was named on the list as having planted 535 acres of cotton. It is clear that a contract was made whereby Southmost agreed to deliver to Dunavant all of the cotton produced in 1973 from the Otsuki 535 acres at the contract price of 35.5 cents per pound. See *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1 (Tex.Sup. 1976).

There was consideration for the contract. The changes on the face of the original contract made by Dunavant consisted only of the change of "4,500 acres" to "5,347 acres". That change was prompted solely by Hill's writing "attached List 5,347 acres" on the face of the original contract and the actual attachment thereto of a list which, in fact, did show a total of 5,347 acres covered by the contract. The action by Dunavant in this respect did not constitute such a change in the contract which would excuse Southmost from delivering any of the cotton produced from the 5,347 acres described in the list. After all parties were fully aware of the fact that Otsuki would not sell or deliver any of his cotton to Dunavant under the terms of the contract in question, Dunavant was then at liberty to negotiate directly with Otsuki for the purchase of such cotton independently of the contract. Southmost's argument cannot be sustained.

■ Hill, as general manager for Southmost, had authority to bind Southmost by contract. He did so in this case. It is conclusively shown by the evidence that Hill represented to Dunavant that Southmost would sell and deliver the Otsuki cotton produced from Otsuki's 535 acres to Dunavant for 35.5 cents per pound. That was not done. The failure by Southmost to deliver such cotton amounted to a breach of contract, which justified Dunavant in thereafter and without delay, purchasing directly from Otsuki his 1973 cotton production in substitution for the same cotton which was

due to be sold and delivered to it by Southmost under the contract. See Tex. Bus. & Comm. Code Ann. §§ 2.711(a)(1) and 2.712(a) (1968). There is no showing that the acquisition by Dunavant of the Otsuki cotton was not in good faith or that the price paid was not a fair and reasonable price on the day of purchase. The finding by the jury that the purchase price of 65 cents per pound paid to Otsuki was reasonable is not challenged by Southmost by a cross point.

■ The undisputed evidence showed that Hill, the general manager for Southmost, who did not have any authority from Otsuki to contract for the sale of Otsuki's 1973 cotton production, did, however, represent to Dunavant, that Southmost did have such authority. It is further conclusively established by the evidence that Southmost did not deliver Otsuki's 1973 cotton production to Dunavant in accordance with the terms of the contract, and that such failure constituted a breach of contract which damaged Dunavant in the amount of $77,708.90, the difference between the market price of the Otsuki 1973 cotton production at the time of harvest and the contract price. There is no evidence which supports the findings of the jury on which the judgment is based. It was reversible error to render a take nothing judgment against Dunavant. Points 1, 3, 4 and 5 are sustained.

Dunavant, in points 2 and 6, also attacks the jury's findings: 1) that Southmost did not represent that it had the authority to sell Otsuki's cotton, and 2) that Southmost did not fail to deliver any cotton covered by the contract by "against the great weight and preponderance of the evidence" points. In view of our decision to reverse the judgment of the trial court and to render judgment for Dunavant, it is not necessary that we dispose of those points.

The judgment of the trial court is reversed and judgment is here rendered that W. B. Dunavant and Company, plaintiff-appellant, recover of and from Southmost Growers, Inc., defendant-appellee, the sum of $77,708.90, together with interest thereon

at the rate of 9% per annum from January 28, 1977 until paid, and for all costs of suit.

REVERSED and RENDERED.