**In re NEW VALLEY CORPORATION,
Debtor.**

**Bankruptcy No. 91–27704.**

United States Bankruptcy Court,
D. New Jersey.

June 6, 1994.

See also, 168 B.R. 73.

Nixon, Hargrave, Devans & Doyle, New York City, Cassidy, Foss & San Filippo, Red Bank, NJ, for Datek–InstaCard Corp.

Ohrenstein & Brown, New York City, Crummy, Del Deo, Dolan, Griffinger & Vecchione Newark, NJ, for New Valley Corp., debtor.

## OPINION

WILLIAM H. GINDIN, Chief Judge.

### PROCEDURAL BACKGROUND

This matter comes before the court on a motion in limine brought by Datek–Instacard Corporation ("Datek") in the course of an estimation proceeding. The motion seeks a ruling whether the doctrine established by the United States Supreme Court in *D'Oench Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942) ("*D'Oench, Duhme*") applies to the claims at issue in this proceeding. The estimation proceeding, which was ordered on December 17, 1993 and March 2, 1994, by Judge Novalyn L. Winfield of this Court, seeks to estimate both the claims of debtor (plaintiff and counter-claim defendant) and Datek (defendant and counter-claim plaintiff) in a civil action presently pending in United States District Court for the District of New Jersey before District Judge Maryanne T. Barry and Magistrate Judge Stanley Chesler. The undersigned is presiding over this estimation hearing and as a preliminary matter, the subject motion in limine. This court held a hearing on the motion in limine on May 6, 1994. This court has jurisdiction over the matter pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(b)(1). This is a core matter under §§ 157(b)(2)(A), (B), and (O).

### STATEMENT OF FACTS

This estimation proceeding arises out of a complex acquisition of a utilities bill payment

business (the "Business") by debtor, New Valley Corporation, formerly known as Western Union Corporation ("debtor" or "New Valley") from Datek, an indirect subsidiary of Goldome FSB[1]. The Business consisted of a network of 2,500 to 3,000 agents who accepted in person payments from customers of utilities companies. The agents deposited those payments into their own bank accounts which were later consolidated with the bank accounts of the Business. Regardless of remittances from agents, the Business was contractually required to remit to the utilities, payments equal to that collected from the customers. The utilities paid the Business a fee for this service and the Business, in turn, paid the agents a commission.

The Business was comprised of several entities. One portion of the Business, Goldome Payments, Inc. ("GPI"), was a wholly-owned subsidiary of Datek. Another entity, National Payments Network, Inc. ("NPN") was owned eighty-five percent by two individuals, Louis Krouse and Mark C. Perlberg, and fifteen percent by minority shareholders. A third entity was National Payment Centers, Inc. ("NPC"), a wholly owned subsidiary of NPN. The final component of the business was known as NPP, a New York general partnership between Datek and NPN.

In December, 1988, New Valley's Chief Executive Officer (then President), Bob Amman, learned about the Business from an article in Forbes Magazine and decided aggressively to pursue acquiring it. After several meetings among the principals of New Valley, Datek and NPN, New Valley began to conduct due diligence. During the course of due diligence, New Valley learned of a sizable accounts receivable (approximately eight million dollars) due from the agents, as well as a problem with a negative float, that is, the lag time between remittances from agents and payments that the Business was obliged to make to the utilities. The negative float and receivable problems are at the heart of the litigation underlying this estimation proceeding.

By April 17, 1989 Goldome and New Valley signed a letter of intent, and on May 12, 1989 a stock purchase agreement was signed by Datek and New Valley. Under the stock purchase agreement, New Valley agreed to purchase (through a newly formed subsidiary) from Datek all of the outstanding stock of GPI as well as Datek's portion of NPP for four million dollars in cash and a five million four hundred thousand dollar note guaranteed by New Valley ("$5.4 Million Note"). The $5.4 Million Note specifically referenced that it was being issued in connection with the stock purchase agreement. New Valley was permitted to offset indemnification rights due under the stock purchase agreement against payments due Datek under the $5.4 Million Note. The transaction specifically omitted the purchase of the accounts receivables due from the agents.[2]

The stock purchase agreement was rather complex, and typical of agreements in corporate acquisitions, contained representations and warranties by the parties (particularly Datek) that survived the closing for three years. The stock purchase agreement also obliged Datek to continue running the back office for months after closing.

The stock purchase agreement also made reference to a transition agreement which was part and parcel of the transaction. Under the transition agreement, Datek was further obliged to assist New Valley (at the election of New Valley) in back-office transitional services. The transition agreement also established a post-closing "true-up" procedure to determine which utility credits received were attributable to Datek's pre-closing accounts receivables (not purchased by New Valley). According to the true-up procedure, Datek and New Valley were to work together to collect and identify pre-closing receivables and New Valley was obliged to remit them to Datek.

---

1. Datek is wholly owned by Diversified Financial Services, Inc., which is wholly owned by Goldome Bank.

2. New Valley also entered into a stock purchase agreement with NPN and NPC providing for the purchase of their portion of the Business, at a price of four million dollars in cash and an additional three million nine hundred thousand dollar earn-out based on post-closing commissions.

On July 14, 1989, the parties consummated the transaction and signed an amended stock purchase agreement, which among other revisions, deleted the requirement for certified financial statements of all the entities comprising the Business to be provided by Peat Marwick Main & Co. The closing date was effective as of midnight, July 16, 1989, and as of July 17, 1989, New Valley owned the Business.

After the closing, Datek performed back-office transition services, and New Valley assisted Datek in identifying and collecting pre-closing receivables. However, by January 1990, it became apparent to New Valley, that the Business's negative float was increasing exponentially, and that the agent network was riddled with fraud. At this stage, the relationship between New Valley and Datek deteriorated, all cooperation with Datek in identifying and collecting pre-closing receivables ceased and New Valley stopped making semi-annual interest payments in January 1990, and failed to make its first annual principal payment ($1.8 million) on the $5.4 Million Note due July 14, 1990.

On May 4, 1990, New Valley filed a complaint in United States District Court for the District of New Jersey against Datek and Goldome. On June 11, 1990, prior to the service of a responsive pleading, New Valley amended its complaint alleging breach of warranty, securities fraud, negligent misrepresentation, breach of contract, and specific performance. New Valley contended that Datek (specifically Orinn D. Tobbe, chairman of Datek and a director of Goldome) and Goldome misrepresented the nature of a systemic flaw in the Business, namely the serious agent receivable problem. On August 1, 1990 Goldome and Datek filed an answer to the amended complaint, denying the allegations and asserting a counterclaim for payment of funds owed to Datek for payment of the $5.4 Million Note and breach of the transition services agreement (reimbursement of pre-closing receivables).

On August 15, 1990, Datek and Goldome filed third-party complaints against Krouse and Perlberg for judgment of joint and several liability, and Krouse and Perlberg, in turn, filed a fourth party complaint against Tobbe for contribution and breach of fiduciary duty.

On May 31, 1991 Goldome was taken over by the Federal Deposit Insurance Corporation ("FDIC"), which entity has served as a receiver since that date. As a result all district court proceedings were stayed by Magistrate Judge Stanley Chesler of the District of New Jersey from July 29, 1991 to August 30, 1991.

On November 15, 1991 an involuntary petition was filed against New Valley under chapter 11 of title 11 of the United States Code, and on June 16, 1992 an order for relief was entered with the consent of New Valley. Magistrate Chesler, further stayed the district court proceedings to February 1, 1993.

On March 19, 1993, New Valley filed a second action in New Jersey District Court against Tobbe for fraud, negligent misrepresentation, negligence, indemnification and contribution. This action was consolidated with the pending district court litigation on July 2, 1993.

On September 30, 1993, Datek filed a proof of claim against Western Union for eighteen million eight hundred thousand dollars, and on November 18, 1993 New Valley moved for estimation of its claims against Goldome and Datek. Datek vigorously contested that motion, but Judge Winfield ordered the estimation proceeding on December 17, 1993. Datek filed its notice of appeal of that order on March 11, 1994, as well as a motion for reconsideration. Judge Winfield denied Datek's motion for reconsideration on April 8, 1994. Datek also amended its proof of claim to $18,468,179 on March 9, 1994. At a conference before this court, trial was set for April 26–28, 1994.

*DISCUSSION*

Datek argues that New Valley's defenses to its claims are barred by the federal common-law doctrine announced by United States Supreme Court in *D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). In *D'Oench, Duhme*, a bank purchased bonds from a securities broker and dealer,

D'Oench, Duhme & Company. *Id.* at 454, 62 S.Ct. at 678. After an eventual default, the broker signed new notes so that the bank could avoid carrying past due bonds on its books. Any payments made on the past due bonds were to be credited against the outstanding balance of the new notes. The receipts for these notes contained the statement, "[t]his note is given with the understanding that it will not be called for payment. All interest payments to be repaid." *Id.* Seven years later, D'Oench, Duhme executed a new note in renewal of the notes it had signed after default. The president of D'Oench, Duhme who had signed the notes knew that the notes were executed so that the past due bonds would not appear as the bank's assets, and that the purpose of the interest payments was to " 'keep the notes alive.' " *Id.*

The bank failed, and the FDIC acquired the renewal note in a purchase and assumption transaction. The FDIC attempted to collect on the note, and D'Oench, Duhme responded by arguing that the note failed for want of consideration and by producing the written receipts which stated that the note would not be enforced.

■ In rejecting D'Oench, Duhme's defense, the Supreme Court explained that federal policy prohibits the misrepresentation of bank assets in a scheme which, in effect, deceives bank authorities. *Id.* at 457, 62 S.Ct. at 679. Carrying the note as an asset amounted to D'Oench, Duhme's permission to mislead bank-examining authorities who inspect the bank's assets on an on-going basis. *Id.* at 460–61, 62 S.Ct. at 680–81. Accordingly, the Court held that D'Oench, Duhme was estopped from raising its defense to enforcement of the note. *Id.* at 461–62, 62 S.Ct. at 681–82. The rule emerging from *D'Oench, Duhme* is that no agreement between a bank and a borrower which does not plainly appear on the face of an obligation or in the bank's official records can be enforceable against the FDIC. *Adams v. Madison Realty & Dev., Inc.,* 937 F.2d 845, 852 (3d Cir.1991).

■ In 1950, Congress enacted 12 U.S.C. § 1823(e), which essentially codifies the principle declared in *D'Oench, Duhme. Adams,*

937 F.2d at 852 (3d Cir.1991); *Federal Deposit Ins. Corp. v. Blue Rock Shopping Ctr.,* 766 F.2d 744, 753 (3d Cir.1985). Section 1823(e) provides as follows:

No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 11 [12 USCS § 1821], either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—

(1) is in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C. § 1823(e). The purposes of this section are to facilitate regulation and to force all loans to undergo a formal evaluation, thereby assuring prudent consideration of *"unusual loan transactions"* and safeguarding against collusion between customers and bank employees on the eve of a bank's failure. *Langley v. Federal Deposit Ins. Corp.,* 484 U.S. 86, 92, 108 S.Ct. 396, 401, 98 L.Ed.2d 340 (1987) (emphasis added).

Despite the *D'Oench, Duhme* and section 1823(e) bar to defenses based on secret agreements, the Third Circuit has acknowledged that in certain situations, *D'Oench, Duhme* and section 1823(e) do not bar defenses. *See Federal Deposit Ins. Corp. v. Bathgate,* 27 F.3d 850, 866–68 (3d Cir.1994); *Blue Rock,* 766 F.2d at 753 (3d Cir.1985) (Third Circuit pointing out that "[s]ection 1823(e) does not ... protect FDIC against all defenses. We have found nothing to demonstrate that the section was designed to protect the FDIC against the consequences

of its own conduct....") (citation omitted).[3] *See also Lesal Interiors, Inc. v. Resolution Trust Corp.*, 834 F.Supp. 721, 731 n. 7 (D.N.J.1993) (juxtaposing the sale of partnership interests in real estate ventures with traditional loans, the court noted that the former was a non-banking transaction falling outside the scope of *D'Oench, Duhme* but the latter was a traditional banking transaction, thereby falling within *D'Oench, Duhme*); *Beener v. LaSala*, 813 F.Supp. 303, 309 (D.N.J.1993) (*D'Oench, Duhme* was no bar to enforcement of an alleged agreement to pay brokerage commissions because there was no secret agreement intended to mislead banking authorities.).

In *Bathgate*, the Third Circuit held that the borrower's defenses were barred by the *D'Oench, Duhme* doctrine and § 1823(e) because the defenses were based on an alleged oral agreement to extend a closing date for certain transactions. *Bathgate*, 27 F.3d at 868 (3d Cir.1994). In so holding, the court distinguished its own case from cases which involved either non-banking assets or transactions,[4] or defenses based on writings containing bilateral obligations.[5] In both instances, the Third Circuit explained, the *D'Oench, Duhme* doctrine had not barred defenses. Since *Bathgate* involved both an identifiable banking asset and unilateral obligations, the Third Circuit held that *D'Oench, Duhme* barred claims against the FDIC.

It is with these non-banking and bilateral exceptions in mind, as acknowledged by the Third Circuit, that this court examines the facts before it.

### NON–BANKING ASSETS OR TRANSACTIONS

■ New Valley asserts that since the stock purchase was a non-banking transaction, the *D'Oench, Duhme* doctrine is inapplicable. Examples of ordinary banking transactions include traditional loan transactions, actual or contemplated, between a borrower and lender or other conventional banking

transactions in the ordinary course, such as the bank entering into vendor agreements or employment agreements. *Thigpen v. Sparks*, 983 F.2d 644, 647 (5th Cir.1993).

■ On the other hand, examples of non-banking transactions include the sale of partnership interests in real estate development ventures, *Alexandria Assocs., Ltd. v. The Mitchell Co.*, 2 F.3d 598, 603 (5th Cir.1993), and the sale of a trust company. *Thigpen*, 983 F.2d at 645. *Alexandria* is factually similar to the instant case. In *Alexandria*, the Mitchells' general partners were corporations, each of which was owned by a real estate company, in turn owned by a bank. *Id.* at 599–600. The Mitchells were also partners in various limited partnerships that owned apartment projects. The president of each "corporate sub-subsidiary," which somewhat controlled the Mitchell partnerships, sold interests in limited partnerships owned by the Mitchells. *Id.* at 600. The purchaser bought the interests in the limited partnerships for $400,000 cash plus a non-recourse loan secured by a mortgage on real estate of the limited partnerships in which the interests were purchased. The purchaser was supposed to syndicate itself, sell its shares, and use the proceeds to pay off the loan indebtedness. Unable to do so, the purchaser fell behind in its loan, the Mitchells foreclosed, and the purchaser filed suit against the Mitchells. Three years later, the bank which owned the corporate partners failed, and the FDIC took over it and all of the bank's subsidiaries.

■ The *Alexandria* Court explained that the consistent focus of the protection of *D'Oench, Duhme* has been on banking transactions in which a federally insured institution engages. *Id.* at 602. The *D'Oench, Duhme* doctrine is not transactionally infinite. Including non-banking transactions within the coverage of § 1823(e) could lead to absurd results. For instance, ordinary trade creditors of banks would be required to have

---

3. In *Blue Rock*, the court also cited *Howell v. Continental Credit Corp.*, 655 F.2d 743 (7th Cir. 1981), to acknowledge exceptions to *D'Oench, Duhme. See infra* p. 89 for discussion on *Howell* and the "bilateral obligations exception" to *D'Oench, Duhme.*

4. *See Agri Export Co–Op v. Universal Sav. Ass'n,* 767 F.Supp. 824 (S.D.Tex.1991).

5. *See Howell v. Continental Credit Corp.,* 655 F.2d 743 (7th Cir.1981).

their purchase orders or other contract documents approved and recorded in the board's minutes if these creditors wanted to avoid any potential "uncollectibility under D'Oench." *Id.* The court declared, "surely ... D'Oench does not apply to subsidiaries of the bank's non-bank subsidiaries[.]" Thus, because *D'Oench, Duhme* was a harsh rule startling in its severity, the *Alexandria* court refused to extend *D'Oench, Duhme* to non-banking transactions. *Id.* at 604.

■ This court finds that the sale of the utility payment business constituted a non-banking transaction. As in *Alexandria,* Datek, the bank's second tier and indirect subsidiary, sold the business. The utility payment business represented a non-banking asset of Goldome. As with a sale of partnership interests in real estate ventures, banks simply do not engage in the sale of a utility payment business in the ordinary course of banking business. This court's conclusion that this was a non-banking transaction is buttressed further by the fact that both Datek and New Valley stipulated to the fact that in "early 1989, the FDIC issued a directive encouraging Goldome to sell its *non-banking* businesses, such as Datek." (emphasis added).

■ Indeed, refusing to apply *D'Oench, Duhme* to the non-banking transaction at hand will not thwart the policies underlying *D'Oench, Duhme.* We agree with the reasoning of the Fifth Circuit in *Alexandria:*

The purposes of neither the recordation nor approval requirements of D'Oench would be furthered by including non-banking transactions within the aegis of the doctrine. The substantial volume of information regarding areas of commerce outside the bank examiners' expertise or cognizance, generated day by day in myriad non-banking transactions, would simply overwhelm the bank's officers and directors; besides, such information would not be likely to aid the examiners in evaluating miscellaneous non-banking assets of the troubled bank. Requiring bank boards or loan committees to consider, approve, and record every transaction entered into by a bank—*and especially by entities held by the bank as investments or subsidiaries*—

would make virtually impossible the performance by officers and directors of their upper level management and policy making functions, not the least of which is deciding constantly whether and on what terms to grant loans.

*Id.* at 603 (emphasis added).

■ To include a non-banking transaction like the sale of a utility payment business within the panoply of *D'Oench, Duhme* "particularly a transaction with subsidiaries of a subsidiary," would extend D'Oench to an undefinable and unlimited category of transactions, giving *D'Oench, Duhme* unlimited reach. *Id.* If this court were to accept Datek's interpretation of *D'Oench, Duhme* doctrine, and then apply *D'Oench, Duhme* to bar New Valley's defenses, every individual who transacted business with a bank, either directly or indirectly, would be required to have all agreements involved to conform to section 1823. Such an expansive interpretation would permit every failed bank to avoid liability on innumerable obligations of the failed institution, as well as obligations of all the institution's subsidiaries, not meeting the requirements of *D'Oench, Duhme* or Section 1823(e). Neither Congress nor the Supreme Court intended such a result by *D'Oench, Duhme* or section 1823(e). *Beener v. LaSala,* 813 F.Supp. 303, 310 (D.N.J.1993). *See also Thigpen* 983 F.2d at 646–47 (5th Cir. 1993) (Section 1823(e) does not apply to a claim arising from a bank's sale of non-banking assets.).

This court, therefore, concludes that the sale of the utility payment business to New Valley constituted a non-banking transaction, falling within the purview of the non-banking exception to the *D'Oench, Duhme* doctrine. Accordingly, *D'Oench, Duhme* will not bar New Valley's claims.

### *BILATERAL OBLIGATIONS*

■ New Valley also argues that its claims pursuant to the transition agreement and the stock purchase agreement constitute bilateral obligations of the claims pursued by Datek and the FDIC, and therefore, *D'Oench, Duhme* is inapplicable. The Third Circuit Court of Appeals has acknowledged

circumstances where the *D'Oench, Duhme* doctrine does not prohibit defenses based on writings containing bilateral obligations. *Federal Deposit Ins. Corp. v. Bathgate,* 27 F.3d 850, 867–68 (3d Cir.1994) (citing *Howell v. Continental Credit Corp.,* 655 F.2d 743 (7th Cir.1981)).

In *Howell,* FDIC became the lessor of equipment to the appellant, as lessee. *Id.* at 745. FDIC sought arrearages on leases and Howell defended on the basis that the original lessor failed to provide consideration. Howell had been a sole shareholder of a television company, and paid several thousand dollars for equipment, paying cash and furnishing a letter of credit for the balance. *Id.* at 744. Eventually, Howell restructured the acquisition of the equipment as a lease. The lessor was to obtain title to the equipment. The lessor discounted the leases to a bank, but failed to purchase most of the equipment. Howell claimed that the original lessor was to obtain title to the equipment and its failure to do so was a failure of consideration.[6] The bank eventually became insolvent and the FDIC intervened after acquiring interest in the leases. FDIC claimed that *D'Oench, Duhme* barred Howell's claims. *Id.* at 745.

The *Howell* Court held that as opposed to a situation where the defense was founded upon separate and undisclosed agreements, of which the FDIC could have no notice, *D'Oench, Duhme* and section 1823(e) are inapplicable where the documents or instruments that the FDIC seeks to enforce facially manifest bilateral obligations and serve as the basis of the parties' defense. *Id.* at 747. Additionally, when "... the asset upon which the FDIC is attempting to recover is the very same agreement that the makers allege has been breached by the FDIC's assignors, ... [n]one of the policies that favor the invocation of ... [§ 1823(e)] are present ... because the terms of the agreement that tend to diminish the rights of the FDIC

appear in writing on the face of the agreement that the FDIC seeks to enforce." *Id.*

■■■ The agreement sought to be enforced only has to flag the issue to subsequent purchasers. The fact that the court has to go outside to determine strength and validity of the defenses is not fatal where the foundation and basis of the defense is in the document, thus meeting non-secrecy requirements of section 1823(e).

Courts have extended the reasoning in *Howell* to defenses contained in integral or closely related documents. *See, e.g., Federal Deposit Ins. Corp. v. Laguarta,* 939 F.2d 1231, 1238–39 (5th Cir.1991) (*D'Oench, Duhme* does not bar an affirmative defense based on "funding obligations ... spelled out" in the loan and modification agreements that underlie the note which the FDIC seeks to enforce.).

This court concludes that New Valley's claims were based upon bilateral obligations similar to those in *Howell* and *Laguarta,* thereby falling within the second exception to the *D'Oench, Duhme* doctrine. The stock purchase agreement and the promissory note were part of one intertwined transaction whereby New Valley purchased and Datek sold the stock of the utility bill payment business.

The promissory note explicitly states that it was "issued in connection with the Stock Purchase Agreement" and expressly refers any reader to the stock purchase agreement for details of payment of the note. The stock purchase agreement also references the note, and attaches it thereto. Both the stock purchase agreement and the note were filed in Datek's records. Since the note and the agreement specifically cross-referenced each other, any examiner had notice of the agreement and any accompanying risk. As in *Howell,* there was no "secret" agreement that had the effect of misleading the FDIC examiners.

---

**6.** Regarding the lessors obligation to acquire title to the equipment, the leases set forth this obligation as follows: Title to Equipment As Personal Property ... The Equipment shall always remain and shall be admitted to be personal property ... and the title thereto shall remain in

lessor exclusively.... and indirectly, such as within the definition of "actual costs" from which the rental payments were computed. The definition provides: " 'Actual Costs': means the cost to Lessor of purchasing and delivering the Equipment to Lessee...."

In addition to the note and the stock purchase agreement being intertwined, once the promissory note was executed, one party was not left with an unconditional obligation to perform. The language in the stock purchase agreement and the promissory note did contain specific language indicating bilateral obligations, thereby giving notice to the FDIC of the parties' specific arrangement. The stock purchase agreement contained warranties and representations by the parties that expressly survived for three years after the closing, and the stock purchase agreement obliged Datek to continue running the back office for months after the closing.

Moreover, the stock purchase agreement referred to a transition agreement which provided, *inter alia*, that Datek and New Valley would engage in a post-closing accounting of certain transactions taking place on or prior to the closing date. Also, the transition agreement stated that it was an "integral part of the acquisition by ... [New Valley] of the Payments Business...." Under the transition agreement, Datek was to assist New Valley in back-office transitional services. The transition agreement provided that "Datek specifically acknowledge[d] that its full cooperation and assistance ... [in the transition of responsibilities] ... are integral parts of the purchase transaction embodied in the Datek Stock Purchase Agreement." Pursuant to the transition agreement, Datek furnished back office support to the business including switching, settlement of payments to utilities, and bank and agent reconciliations.

Based upon the language in the documents set forth above and the parties own conduct, this court finds that these continuing obligations constituted bilateral obligations on the part of both parties. Any officer of the FDIC who examined the documents had sufficient notice of the existence and terms of the agreement, such that the examiner would not be misled. Also, as the *Howell* court explained, since both Datek and New Valley are claiming that the other breached the transition agreement, the FDIC cannot seek to enforce one part of the agreement and simultaneously seek to bar another part of the same agreement. *Howell*, 655 F.2d at 747 (7th Cir.1981). Datek cannot assert New Valley's due diligence as an affirmative defense, and also argue that New Valley is barred from raising written assurances given to it by Datek during due diligence.

### CONCLUSION

As a result of the foregoing analysis and the conviction that the *D'Oench, Duhme* doctrine does not apply in this case because it involves a non-banking transaction and the relevant note is a bilateral agreement, this court holds that New Valley's claims and defenses will not be barred.