RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0015p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

COMMERCIAL LAW CORPORATION, P.C.,

*Plaintiff-Appellant,*

*v.*

No. 14-1399

FEDERAL DEPOSIT INSURANCE CORPORATION, as
Receiver for Home Federal Savings Bank,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:10-cv-13275—Sean F. Cox, District Judge.

Argued: November 19, 2014

Decided and Filed: January 27, 2015

Before: DAUGHTREY, CLAY, and COOK, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** L. Fallasha Erwin, COMMERCIAL LAW CORPORATION, P.C., Detroit, Michigan, for Appellant. Jerome A. Madden, FEDERAL DEPOSIT INSURANCE CORPORATION, Arlington, Virginia, for Appellee. **ON BRIEF:** L. Fallasha Erwin, COMMERCIAL LAW CORPORATION, P.C., Detroit, Michigan, for Appellant. Jerome A. Madden, FEDERAL DEPOSIT INSURANCE CORPORATION, Arlington, Virginia, for Appellee.

_____

**OPINION**

_____

COOK, Circuit Judge. Plaintiff Commercial Law Corporation, P.C. (CLC) sued the Federal Deposit Insurance Corporation (FDIC) in its capacity as receiver for the Detroit-based

1

Home Federal Savings Bank ("the bank"), claiming $176,750 in unpaid attorneys' fees for legal services rendered to the bank in 2008 and 2009. The district court granted the FDIC's motion for summary judgment, concluding that 12 U.S.C. §§ 1821(d)(9)(A) and 1823(e)(1) precluded enforcement of plaintiff's unrecorded fee agreement with the bank. These statutes, which impose documentation requirements for bank agreements, derive from the common-law *D'Oench* doctrine, an estoppel rule akin to a statute of frauds that shields the FDIC from claims and defenses based on unwritten agreements that reduce bank assets. *See D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 456–62 (1942); *First State Bank of Wayne Cnty. v. City & Cnty. Bank of Knox Cnty.*, 872 F.2d 707, 715–16 (6th Cir. 1989).

CLC appeals, arguing that *D'Oench* and its statutory progeny do not apply to its legal services arrangement with the bank. We agree and REVERSE.

I.

CLC's principal, L. Fallasha Erwin, served as general counsel for the bank from the late 1980s until the fall of 2009. According to CLC, it began deferring invoicing for services to the bank in 2008 when the bank fell on hard times. The bank continued to struggle, and the Office of Thrift Supervision closed the bank and put it into receivership during the first week of November 2009. CLC claims that, five days before the FDIC takeover, the bank granted it security interests in two bank properties. Inexplicably, CLC waited until late January 2010 to record the attorney liens for these security interests.

Following the bank's failure, CLC filed a claim with the FDIC seeking $176,750 in deferred legal fees for the period May 2008 to November 2009. The FDIC denied the claim, prompting this litigation. Though CLC's complaint mentions the security interest in passing and requests only the "attorneys fees as invoiced plus attorney fees and costs . . . wrongfully incurred in this matter," the district court construed the complaint as presenting separate breach-of-contract and attorney-lien claims.

CLC's characterization of its fee arrangement with the bank evolved over the course of this litigation. Although CLC initially denied possessing the original retainer agreement, resting its claim on a series of oral agreements and modifications, CLC's position changed in 2013 after

the FDIC moved for summary judgment. Presented with the FDIC's challenge to the enforceability of his undocumented fee arrangement, Erwin produced a 1989 retainer agreement and stated that the deferral of fee payments "was not an amendment of the original retainer agreement." The FDIC moved to strike the newly produced evidence under Federal Rule of Civil Procedure 37(c).

The district court granted the FDIC's motions to strike and for summary judgment. With regard to the newfound retainer agreement, the court found the evidence prejudicial and the delay not "substantially justified," stating that CLC "offered *no credible reason* why it produced the purported written agreement after the close of discovery." Yet, considering the stricken retainer agreement for purposes of argument, the court deemed the fees arrangement unenforceable against the FDIC because it did not comply with § 1823(e)'s documentation requirements. And, to the extent CLC relied on the security interests to establish the fees claim, the court found them similarly deficient.

Essential to these holdings, the district court rejected CLC's argument that the documentation requirements of § 1823(e) and the *D'Oench* doctrine apply only to secret agreements affecting traditional banking transactions, like loans. Citing this court's decision in *First State Bank of Wayne County v. City & County Bank of Knox County*, 872 F.2d at 716, the district court reasoned that § 1823(e) governs agreements implicating both bank assets and liabilities, including liabilities on service contracts.

In addition to these findings, the court found the attorney liens unenforceable under 12 U.S.C. § 1823(e)(12) because they "were taken in contemplation of the Bank's insolvency." The court also acknowledged evidence indicating that Erwin and the bank chairman may have backdated the security interests to predate the FDIC's takeover of the bank. The court observed that "Mr. Erwin may well have fraudulently created and back-dated the lien documents at issue," but "conclude[d] that it would not be appropriate to make a ruling on this issue without . . . an evidentiary hearing." CLC timely appeals.

II.

Although it objects to numerous aspects of the district court's decisions, CLC adequately develops only three issues for our review: (1) the applicability of *D'Oench* and § 1823(e)(1) to its claim for attorneys' fees; (2) the district court's exclusion of the retainer agreement as a discovery sanction; and (3) the court's conclusion that CLC's security interests were granted in contemplation of the bank's insolvency.[1] The district court had federal-question jurisdiction to hear this suit against the FDIC under 12 U.S.C. § 1819(b)(2)(A), and we exercise appellate jurisdiction under 28 U.S.C. § 1291.

III.

We review de novo both the grant of summary judgment and legal issues concerning *D'Oench* and related statutory provisions. *Nat'l Enters., Inc. v. Smith*, 114 F.3d 561, 563 (6th Cir. 1997); *E.I. du Pont de Nemours & Co. v. FDIC*, 32 F.3d 592, 595 (D.C. Cir. 1994).

A. *The Development of* D'Oench *& Its Statutory Analogues*

The Supreme Court first articulated the so-called *D'Oench* doctrine in a 1942 case involving a failed bank's lending practices. The FDIC sought to collect on a demand note held by the newly insolvent bank, and the bond salesman who issued the note objected, contending that the bank secretly promised not to collect on the note. *D'Oench*, 315 U.S. at 454. Drawing upon the criminal penalties imposed under the Federal Reserve Act, the Supreme Court recognized a "federal policy . . . to protect [the FDIC] . . . from misrepresentations made to induce or influence the action of [the FDIC], including misstatements as to the genuineness or integrity of securities in the portfolios of banks which it insures or to which it makes loans." *Id.* at 459. The Court therefore estopped the notemaker from relying on the secret promise to prevent the FDIC from collecting on the note. *Id.* at 461–62; *see also First State Bank*, 872 F.2d at 715.

---

[1]CLC's brief objects to three other matters in passing: the district court's order striking its jury demand for the lien claim; a series of statements and evidentiary rulings by the court that CLC believes reflect judicial bias; and the court's suggestion that counsel fraudulently backdated lien documents. CLC forfeited the first two issues by neglecting to develop their factual and legal bases, *see Benge v. Johnson*, 474 F.3d 236, 245 (6th Cir. 2007), and we have no occasion to review the third issue, because the district court declined to rule on that ground.

Congress substantially codified the *D'Oench* doctrine in section 13(e) of the Federal Deposit Insurance Act of 1950, 64 Stat. 873, 889, 12 U.S.C. § 1823(e). That provision currently states:

> No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the [FDIC] unless such agreement—
>
>> (A) is in writing,
>>
>> (B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
>>
>> (C) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
>>
>> (D) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C. § 1823(e)(1). Because CLC does not suggest that any of its documents satisfy the statute's substantive requirements, we direct our attention to the opening paragraph of the provision, which establishes its scope.

The Supreme Court gave some guidance on this front in *Langley v. FDIC*, when it held that "[a] condition to payment of a note, including the truth of an express warranty, is part of the 'agreement' to which the writing, approval, and filing requirements of 12 U.S.C. § 1823(e) attach." 484 U.S. 86, 96 (1987). The Court rejected a narrow interpretation of the term "agreement" that would have limited it to promises to take future action, but acknowledged an additional contextual limitation in the statute's "requirement that the agreement in question 'ten[d] to diminish or defeat the right, title or interest' of the FDIC in the asset." *Id.* at 93; *see also Thigpen v. Sparks*, 983 F.2d 644, 648–49 (5th Cir. 1993) (concluding that, despite *Langley*'s broad interpretation of "agreement," § 1823(e)'s contextual "modifiers," pertaining to the acquisition of an asset, applied to § 1821(d)(9)(A)). Though it had no occasion to expound upon that boundary, *Langley* identified two overarching purposes for the statute's documentation requirements, both pertaining to oversight of a bank's assets and lending practices:

One purpose of § 1823(e) is to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets. Such evaluations are necessary when a bank is examined for fiscal soundness by state or federal authorities, see 12 U.S.C. §§ 1817(a)(2), 1820(b), and when the FDIC is deciding whether to liquidate a failed bank, see § 1821(d), or to provide financing for purchase of its assets (and assumption of its liabilities) by another bank, see §§ 1823(c)(2), (c)(4)(A). The last kind of evaluation, in particular, must be made "with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services." *Gunter v. Hutcheson*, 674 F.2d [862, 865 (11th Cir. 1982)]. Neither the FDIC nor state banking authorities would be able to make reliable evaluations if bank records contained seemingly unqualified notes that are in fact subject to undisclosed conditions.

A second purpose of § 1823(e) is implicit in its requirement that the "agreement" not merely be on file in the bank's records at the time of an examination, but also have been executed and become a bank record "contemporaneously" with the making of the note and have been approved by officially recorded action of the bank's board or loan committee. These latter requirements ensure mature consideration of unusual loan transactions by senior bank officials, and prevent fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure. Neither purpose can be adequately fulfilled if an element of a loan agreement so fundamental as a condition upon the obligation to repay is excluded from the meaning of "agreement."

*Langley*, 484 U.S. at 91–92.

Against this backdrop, Congress enacted the Financial Institution Reform, Recovery and Enforcement Act (FIRREA) of 1989, Pub. L. No. 101-73, 103 Stat. 183, which made two changes relevant to this dispute. First, FIRREA amended § 1823(e)(1) to clarify that its protection extended to assets acquired by the FDIC in its capacity as receiver. Second, it adopted a new provision, codified at 12 U.S.C. § 1821(d)(9)(A), extending § 1823(e)(1)'s protections to affirmative claims against the FDIC. With one exception not relevant here,[2] that provision states: "any agreement which does not meet the requirements set forth in section 1823(e) of this title shall not form the basis of, or substantially comprise, a claim against the [FDIC]." 12 U.S.C. § 1821(d)(9)(A). This new provision takes center stage in this suit against the FDIC.

---

[2]Section 1821(d)(9)(A) exempts certain inter-bank credit extensions from § 1823(e)(1)'s requirements. *See* 12 U.S.C. § 1821(d)(9)(A)–(B).

The FDIC contends that either the statutory provisions or the common-law *D'Oench* doctrine bars CLC's undocumented fees arrangement. Though the parties and the district court at times blur the two analyses, we review them separately. *See Hall v. FDIC*, 920 F.2d 334, 339 (6th Cir. 1990) (concluding that § 1823(e)(1) complements, rather than displaces, *D'Oench*). We begin with the statutory argument adopted by the district court.

*B. The FDIC's Statutory Argument*

First, the FDIC argues that § 1821(d)(9)(A)'s broad "any agreement" language encompasses CLC's legal services arrangement with the bank. Unlike § 1823(e)(1), the FDIC notes, the new provision lacks language constraining its scope to agreements affecting bank assets. *Compare* 12 U.S.C. § 1823(e)(1) (extending to agreements that "tend[] to diminish or defeat the interest of the [FDIC] in any asset acquired by it . . . as a receiver," and demanding a writing executed "contemporaneously with the acquisition of the asset"), *with* 12 U.S.C. § 1821(d)(9)(A) (stating that "any agreement which does not meet the requirements . . . in section 1823(e) of this title shall not form the basis of . . . a claim against the [FDIC]"). Yet, following the FDIC's argument to its logical conclusion, § 1821(d)(9)(A)'s documentation requirements (those incorporated from § 1823(e)(1)) would apply to any agreement of any kind, including the myriad services banks contract for in the course of business: utilities, janitorial services, landscaping, supplies, etc. That would be a considerable expansion of the traditional *D'Oench* doctrine and § 1823(e)(1)'s statutory protections, at least for claims against the FDIC.

The Fifth Circuit examined these problems with the FDIC's interpretation in *Thigpen v. Sparks*. There, the FDIC argued that the statutes barred a breach-of-warranty claim against the FDIC for misrepresentations allegedly made by the now-insolvent bank during the sale of a trust company. The court disagreed, reasoning:

> [I]f § 1821(d)(9)(A) were to apply to claims arising from *any* agreement entered into by a depository institution, absurd consequences would result. A claimant who furnished office supplies to the failed bank could not assert a claim unless his contract was (1) in writing, (2) executed by him and the bank contemporaneously with the sale of office supplies, (3) approved and recorded in the bank's board of directors' minutes and (4) continuously maintained as a bank record. Such requirements would render unenforceable the claims of nearly all bank trade creditors. Take another example: if an employee claimed to have been

wrongfully denied reimbursement for travel expenses, the "agreement" would, under FDIC's reasoning, be unenforceable unless it had jumped through the § 1823(e) hoops. These results transform § 1821(d)(9)(A) from a provision protecting the failed bank's loan portfolio from *D'Oench*-like secret agreements into a meat-axe for avoiding debts incurred in the ordinary course of business. Far-reaching as some of FIRREA's provisions were, we doubt that this extravagant extension of § 1823(e) would have occurred, as it did, unremarked in the legislative history.

Because § 1821(d)(9)(A) applies to the same type agreements tied to "acquisitions" of "assets" as does § 1823(e), it cannot apply in this instance to the alleged breach of a warranty by the bank when it sold [the company] . . . .

*Thigpen*, 983 F.2d at 649.

The Seventh Circuit voiced similar concerns in *John v. Resolution Trust Corp.*, when it declined to apply the statutes and *D'Oench* to bar a fraud claim related to a lending institution's sale of real property. 39 F.3d 773, 776–79 (7th Cir. 1994). Noting § 1823(e)'s "require[ment of] an identifiable [bank] 'asset,'" the court concluded that (i) "§ 1823(e) applies only to conventional loan activities," and (ii) "the only sensible reading of § 1821(d)(9)(A) must limit its scope to the loan-related transactions covered by § 1823(e)." *Id.* at 776. The court worried that a broader construction of "agreement" in § 1821(d)(9)(A) "would mean that . . . trade creditors could only enforce agreements with the bank against the [receiver] if the bank's board of directors had approved and recorded the deals." *Id.*

The FDIC offers no contrary authority extending the statutory documentation requirements to service contracts or, more generally, banks' accounts payable.[3] Instead, the FDIC directs our attention to its 1997 policy statement, which disagrees with *Thigpen* and *John*. Policy Statement, 62 Fed. Reg. 5984, 5984–85 (Feb. 10, 1997). The policy statement expresses the "FDIC's view" that Congress intended for §§ 1821(d)(9)(A) and 1823(e) to "be interpreted in a manner consistent with the policy concerns underlying the D'Oench doctrine," such that "these sections bar claims that do not meet the enumerated recording requirements set forth in section 1823(e), *regardless of whether a specific asset is involved*." *Id.* at 5984 (emphasis added). It further offers a vague explanation for giving § 1821(d)(9)(A) a broader scope than § 1823(e)(1).

---

[3]*First State Bank*, relied upon by the district court, provides no guidance on these statutory provisions, because the parties limited their arguments to *D'Oench*. 872 F.2d at 716.

> Section 1823(e) applies only with respect to agreements that pertain to assets held by the FDIC because the function of that section is to bar certain defenses to the FDIC's collection on such assets. Section 1821(d)(9)(A)'s function, in contrast, is to bar certain affirmative claims against the FDIC. It does so in order to affect primary conduct by providing an incentive for parties contracting with institutions to document their transactions thoroughly.

*Id.* Yet, these passages fail to identify statutory language or legislative history suggesting that *Congress* intended § 1821(d)(9)(A) to extend the statutory recording requirements to all agreements, regardless of their relevance to bank lending activities.

The FDIC's broad interpretation of § 1821(d)(9)(A) leaves the scope of the statutory protections to the FDIC's unfettered discretion. The policy statement's position on vendor services reflects this view, stating that:

> D'Oench or the statutory provisions shall not be used as a defense against claims by vendors who have supplied goods and/or services to failed institution pre-closing when there is clear evidence that the goods/services were received. . . .
> . . . When there is no evidence that goods or services were received by the failed institution or in other appropriate circumstances, the defenses may be asserted after approval by Washington.

*Id.* at 5986.[4] Indeed, when asked at oral argument whether this approach reduces to *just trust us*, the FDIC readily agreed. (O.A. at 22:00–35.) The absence of objective principles to guide the application (and expansion) of *D'Oench* and its statutory progeny gives us pause.[5]

The FDIC recognizes that its policy statement receives only *Skidmore* deference, calibrated according to the "thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *S. Rehab. Grp., P.L.L.C. v. Sec'y of Health & Human Servs.*, 732 F.3d 670, 685 (6th Cir. 2013) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). We find

---

[4]Notably, the policy statement provides the example of a contingency fee attorney with an undocumented fees arrangement as an example of a vendor service that would require "Washington approval . . . before asserting D'Oench or the statutory provisions." Policy Statement, 62 Fed. Reg. at 5986.

[5]The FDIC also defends its policy statement on the ground that FIRREA designated attorneys as "institution affiliated parties." But the relevant provision, 12 U.S.C. § 1813(u), does so only with regard to attorneys "who knowingly or recklessly participate[] in" legal violations, breaches of fiduciary duties, or "unsound practice[s]." 12 U.S.C. § 1813(u)(4)(A)–(C). It does not support the FDIC's claim that § 1821(d)(9)(A) applies to legal services. And, though the FDIC has alleged fraud with regard to CLC's security interests, the district court made no findings in this regard.

the policy statement unpersuasive in light of the evolution of the statutory provisions, the reasons stated in *Thigpen* and *John*, and Congress's willingness to leave these provisions undisturbed during the intervening twenty years.

## C. *The FDIC's* D'Oench *Argument*

Pivoting to the common-law *D'Oench* doctrine, the FDIC asserts that this court and others have already expanded *D'Oench* to non-asset situations, including agreements affecting bank liabilities. *See, e.g.*, *Hall*, 920 F.2d at 339 (explaining that the *D'Oench* doctrine "may . . . be invoked even where [the] FDIC does not have 'an interest in an asset'"); *OPS Shopping Ctr., Inc. v. FDIC*, 992 F.2d 306, 309–11 (11th Cir. 1993) (collecting authority applying *D'Oench* to bank liabilities, and concluding that *D'Oench* precluded enforcement of an unrecorded letter of credit issued by the failed bank). Specifically, the FDIC directs our attention to the expansive reasoning of our decision in *First State Bank*, where we stated that:

> The focal point of the [*D'Oench*] analysis is *not on the type of transaction*, but on whether it is in contradiction with what the bank has stated to the FDIC, or is part of any effort to deceive or mislead the FDIC as to the financial status of any banking institution. Thus, if a bank engages in misleading or deceptive behavior toward the FDIC *with regard to either its assets or liabilities*, it may not subsequently take a contrary position in any proceedings involving the FDIC.

*First State Bank*, 872 F.2d at 717 (emphases added, internal citation omitted); *see also id.* ("'[T]he only relevant inquiry' is whether the individual or institution lent itself 'to a transaction which is likely to mislead banking authorities.'" (quoting *FDIC v. Investors Assocs. X., Ltd.*, 775 F.2d 152, 154 (6th Cir. 1985))).

Admittedly, these passages speak of *D'Oench* in broad terms, but they do not justify a blanket extension of *D'Oench* to liabilities unrelated to traditional banking activities. The issue decided in *First State Bank* involved the application of *D'Oench* to a suspect lending practice: the insolvent bank's alleged promise to repurchase loan participations it had sold to another banking entity. *Id.* at 709; *see also id.* at 716 ("If the purchasing bank could require the selling bank to repurchase the assets for full value, the purchasing bank did not assume any risk associated with the borrower's ability to repay the debt."). We actually declined the FDIC's invitation to apply *D'Oench* more broadly to "*any undisclosed agreement* which would affect a

bank's financial condition to the detriment of the public," concluding that the secret buy-back agreement triggered *D'Oench* because it contradicted the financial records provided to the FDIC by both lending institutions. *See id.* at 716–17.

Further, in restating the *D'Oench* rule, *First State Bank* quotes extensively from other Sixth Circuit cases that frame *D'Oench* in the context of a bank's lending activities. *See id.* at 717–18 (quoting from *Investors Assocs. X.* and *FDIC v. Leach*, 772 F.2d 1262 (6th Cir. 1985), both of which address misrepresentations made by "makers" of notes or their co-conspirators). Our later decision in *Hall* does likewise. *See Hall*, 920 F.2d at 338 ("*D'Oench* stands for the proposition that, in order to protect FDIC from misrepresentations as to the . . . assets in the portfolios of banks which FDIC insures, secret agreements that tend to deceive banking authorities cannot be raised as a defense against FDIC when it seeks to enforce a note." (citation and internal punctuation omitted)). Thus, contrary to the district court's conclusion, our cases do not compel application of *D'Oench* to non-banking services purchased by the bank.[6]

In fact, the prevailing authority suggests otherwise. Courts have repeatedly balked at attempts to extend *D'Oench* beyond agreements affecting a bank's lending portfolio and investment products. *See, e.g.*, *Resolution Trust Corp.*, 39 F.3d at 776–78 (misrepresentation claim related to the bank's sale of real property); *du Pont*, 32 F.3d at 597–99 (claim that the failed bank breached fiduciary responsibilities under an expired escrow agreement); *Thigpen*, 983 F.2d at 649 (breach-of-warranty claims related to the insolvent bank's sale of a trust company); *McGarry v. Resolution Trust Corp.*, 909 F. Supp. 241, 245–47 (D.N.J. 1995) (claim that bank violated terms of a lease). That includes service contracts. *See, e.g.*, *E.J. Sebastian Assocs. v. Resolution Trust Corp.*, 43 F.3d 106, 109 (4th Cir. 1994) (questioning the applicability of the *D'Oench* doctrine to a service contract to raise capital for the bank and remanding to the district court); *FDIC v. Brodie*, 602 So. 2d 1358, 1360–61 (Fla. Ct. App. 1992) (rejecting FDIC's attempt to apply *D'Oench* bar to legal services agreement).

---

[6]Nor does the Eleventh Circuit's decision in *Motorcity of Jacksonville, Ltd. v. Southeast Bank N.A.*, 120 F.3d 1140 (11th Cir. 1997) (en banc), cited by the FDIC at oral argument. That decision, like *Hall*, established that §§ 1821(d)(9)(A) and 1823(e)(1) did not extinguish the common-law *D'Oench* doctrine. *Motorcity*, 120 F.3d at 1144 & n.6. It says nothing about whether *D'Oench* or the statutory provisions apply to service contracts.

A service contract simply differs in kind from the sort of agreements affecting bank assets and liabilities contemplated in our *D'Oench* cases; the service-provider performs for the bank, and the bank pays its bill. *See Brodie*, 602 So. 2d at 1360. The FDIC fails to persuade us that service contracts threaten bank viability and impede regulatory oversight to such a degree that courts must step in with the strong medicine of *D'Oench*. In this case, the FDIC did not know that CLC provided services to the bank during the relevant period, and the circumstances surrounding the security interests and substantial fees billed, understandably, raised suspicion.[7] But we have no reason to doubt that the FDIC can assert fraud and other fact-based defenses in disputing its liabilities for these fees.

With respect to CLC's security interests in two bank properties, the FDIC contends that CLC's liens diminish the FDIC's interest in those assets, and thus bring this case under *D'Oench*. The district court agreed, relying on the Eighth Circuit's decision in *North Arkansas Medical Center v. Barrett*, 962 F.2d 780 (8th Cir. 1992). That decision, we note, adopted a much broader reading of *D'Oench* and §§ 1821(d)(9)(A) and 1823(e)(1) than we do. *See N. Ark. Med. Ctr.*, 962 F.2d at 787–89 (holding that the statutory documentation requirements apply to security interests pledged by a failing financial institution as collateral for large certificates of deposit).

Regardless, CLC has not attempted to enforce the attorney liens in this case. The complaint seeks only "an order awarding it its attorney fees as invoiced plus attorney fees and costs so wrongfully incurred in this matter." CLC's appellate briefing on the security interests similarly focuses on the fees claim; the matter appears as a sub-argument of the *D'Oench* issues pertaining to CLC's fees claim and informs the court that CLC "is only seeking compensat[ion] for valuable services" it performed for the bank.

The existence of these disputed liens does not convert CLC's straightforward contract claim for fees into the sort of secret agreement affecting bank assets and liabilities covered by

---

[7]The FDIC also objects that a June 2008 letter from the bank misled federal regulators by stating that "there will not be any additional attorneys' fees charged." But the party the FDIC seeks to estop from collecting service fees—CLC—did not make this allegedly deceptive representation. *Cf. First State Bank*, 872 F.2d at 718 (emphasizing that the party seeking to enforce the repurchase agreement had previously represented to the FDIC that it bought the loans without right of recourse). Viewing the facts in the light most favorable to the non-moving party, as we must, CLC merely agreed to defer collecting attorneys' fees while the bank was in trouble.

*D'Oench*. CLC avers that the bank executed the security interests in November 2009, toward the end of the period of disputed legal services and just before the FDIC takeover. It therefore appears to present an agreement separate from the fee-deferral. Further, as we understand it, the alleged liens constitute a contingent remedy, available only if CLC prevails on the merits of its fees claim and the FDIC then defaults. Even then, CLC would need to demonstrate the legitimacy of the liens in the face of the FDIC's fraud allegations—something Erwin acknowledged during oral argument. Given the uncertain procedural posture of the security-interest claim, the contingent nature of the remedy, and the sparse briefing of these issues, we decline to address any remaining statutory or *D'Oench* issues at this time.

*D. The Stricken Retainer Agreement*

Our conclusion that neither *D'Oench* nor the statutory documentation requirements applies to CLC's claims for legal fees relieves CLC of the obligation to produce a written agreement by the bank for the payment of fees. Because CLC does not rely on the stricken 1989 retainer agreement for either the hours or rates billed in 2008 and 2009, or any other material issue, the discovery-sanction issue has become moot.

IV.

Finally, we address the district court's alternative conclusion holding the attorney liens unenforceable under 12 U.S.C. § 1823(e)(12) because they "were taken in contemplation of the Bank's insolvency." The court premised its ruling on two facts: (i) Erwin's alleged execution of the security interests five days before the bank was put into receivership, and (ii) the bank's understanding that CLC would defer collecting fees until the bank's financial condition improved. The FDIC's briefing adds nothing to this account, other than its assertion that Erwin may have backdated the lien documents. A reasonable factfinder may well agree that this sequence of events demonstrates that the bank executed the security interests in expectation of its demise. But, in the absence of additional evidence demonstrating the parties' actual or constructive knowledge of the bank's financial situation, the temporal proximity of the security interests to the FDIC takeover does not suffice for ruling on this issue as a matter of law. *Cf. Pearson v. Durell*, 77 F.2d 465, 466–68 (6th Cir. 1935) (granting judgment to bank's receiver, where the record established that a bank director retrieved funds from the failing bank

the day before its liquidation, at a time when the bank "had neither the money nor any assets on which it could obtain money to meet its obligations").

V.

For these reasons, we REVERSE the district court's judgment and remand for further proceedings consistent with this opinion.