NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0212n.06

Case No. 23-3344

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
May 10, 2024
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| PROFESSIONAL INVESTIGATING AND CONSULTING AGENCY, INC., dba PICA Corporation, | ) ) ) ) | |
|     Plaintiff-Appellant, | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| v. | ) ) ) | |
| SOS SECURITY, LLC; RODOLFO G. DIAZ; EDWARD B. SILVERMAN, | ) ) ) | OPINION |
|     Defendants-Appellees. | ) | |

Before: SUTTON, Chief Judge; WHITE and THAPAR, Circuit Judges.

THAPAR, Circuit Judge. Starting a business is difficult. Growing it can be even harder. The plaintiff here, however, claims it suffered from far more than entrepreneurial growing pains. It suspects a once-prospective buyer misappropriated its trade secrets, breached its contracts, and unjustly profited from its work. Yet the plaintiff failed to support these allegations, so we affirm the district court's decision to grant summary judgment.

I.

This case involves two private security businesses. Professional Investigating and Consulting Agency, Inc. ("PICA") is a relatively small company that provides consulting-and-investigation, executive-protection, and secure-transportation services. For instance, a company

like Microsoft might hire PICA to track down stolen prototypes or to protect its executives traveling abroad.

SOS Security, LLC ("SOS"), by contrast, was a much larger, "full security" provider with thousands of clients across the globe. R. 65, Pg. ID 435. Although SOS offered a full slate of security services, most of their work was in "uniformed security" at places like embassies—think "guns, gates, and guards." *Id.* at 474–75.

The companies began working together when SOS hired PICA to service some of its clients in Latin America. Soon after the companies' business relationship commenced, SOS floated the possibility of acquisition to Rodolfo Diaz, PICA's Chief Operations Officer. SOS believed acquiring PICA would augment its client base and operating capacity in Latin America. Meanwhile, PICA would benefit from SOS's large-company resources, including its extensive rolodex of Fortune 1000 contacts. Intrigued, Diaz relayed the offer to PICA's Chief Executive and Chief Strategic Officers, brothers Vincent and Vaughn Volpi.

By December 2014, SOS and PICA had signed a nondisclosure agreement and started negotiations. Throughout the due diligence process, and during their joint business ventures, PICA shared a host of financial and operational information. Specifically, PICA provided SOS with multiple years of financial data, customer and vendor lists, salary and pricing schedules, anticipated growth opportunities, and a catalog of PICA's services.

SOS crunched the numbers and delivered its first bid on April 10, 2015, which PICA rejected. After further negotiations, SOS tendered another offer on April 23. PICA turned this one down too.

Shortly after PICA rejected SOS's second bid, Diaz resigned from PICA to work as Head of Global Security for an organization called GlobalFoundries. Diaz had long been frustrated with

Vincent Volpi's leadership and other aspects of PICA's internal culture. And—says Diaz—Vincent Volpi's lackluster management of the acquisition negotiation was the last straw. After Diaz left, SOS assured PICA that his departure wouldn't affect the negotiations. Yet because the companies had been unable to reach a deal after multiple attempts, SOS suggested they postpone further discussion until at least the end of the year.

The companies continued to work together, but they never reached a deal. Then, after a series of billing disputes and personnel issues, SOS and PICA officially cut ties in April 2016.

After the split, SOS continued to grow—both organically and through acquisitions. In 2017, for example, SOS bought AS Solutions, an international executive-protection and security-consulting/investigations firm with a global footprint. And in 2019, SOS was itself acquired by Allied Universal, an even larger security firm.

PICA didn't fare as well. In 2017, company profits nosedived. Clients like Microsoft, Yves St. Laurent, and Bain dropped PICA from their security-contractor portfolios. And two of PICA's past employees left to work for SOS. Olavo Sant'Anna, PICA's regional director in Brazil, began working for SOS in 2016, and Diaz joined SOS in 2017 after his noncompete agreement with PICA expired.

PICA doesn't blame its struggles or SOS's successes on the market's invisible hand. Rather, PICA alleges SOS stole its trade secrets and interfered with its business relationships. Accordingly, PICA sued in Ohio court, raising several state-law claims. SOS removed to federal court and later moved for summary judgment, which the district court granted. PICA now appeals the district court's judgment on its trade-secret-misappropriation, breach-of-contract, and *quantum-meruit* claims.

II.

To survive summary judgment, there must be a genuine dispute over a material fact. Fed. R. Civ. P. 56(a). And while we view the evidence in the light most favorable to PICA, that doesn't mean PICA may simply produce a "scintilla" of evidence or "rest upon [the] mere allegation[s] or denials of [it]s pleading." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 256 (1986). Rather, PICA must marshal enough "specific facts" to create a genuine issue for trial. *Id.* at 256.

With that in mind, we turn to PICA's (A) trade-secret-misappropriation, (B) breach-of-contract, and (C) *quantum-meruit* claims.

A.

Start with the trade-secrets claim. An Ohio trade-secret-misappropriation claim has three elements: "(1) the existence of a trade secret; (2) acquisition of the trade secret as the result of a confidential relationship or through improper means; and (3) an unauthorized use of the trade secret." *Novus Grp., LLC v. Prudential Fin., Inc.*, 74 F.4th 424, 427–28 (6th Cir. 2023) (citing *Tomaydo-Tomahhdo L.L.C. v. Vozary*, 82 N.E.3d 1180, 1184 (Ohio Ct. App. 2017)). *See generally* Ohio Rev. Code §§ 1333.61–1333.69.

The district court identified PICA's alleged trade secrets as "its business models, client lists, pricing structure[,] executive protection know-how, including its local connections and personnel, and financial information." *Pro. Investigating & Consulting Agency, Inc. v. SOS Sec., LLC*, No. 19-CV-03304 (ALM), 2023 WL 2599970, at *4 (S.D. Ohio Mar. 22, 2023). On appeal, SOS doesn't dispute that this information qualifies as trade secrets. Nor does SOS contest that it learned this information during acquisition negotiations.

Instead, the parties key in on the third element—whether SOS *used* PICA's trade secrets without authorization. *See* Ohio Rev. Code § 1333.61(B)(2). By its own admission, PICA didn't

discover direct evidence of such use. PICA instead relies on three buckets of circumstantial evidence. *See Stratienko v. Cordis Corp.*, 429 F.3d 592, 600–02 (6th Cir. 2005) (holding that trade-secret-misappropriation claimants can rely on circumstantial evidence to prove misuse); *Brake Parts, Inc. v. Lewis*, 443 F. App'x 27, 31–32 (6th Cir. 2011) (same).[1] Namely, PICA claims that (1) after the companies parted ways, SOS offered services it couldn't have provided before its collaboration with PICA; (2) SOS provided these services with poached PICA employees; and (3) PICA lost clients and business opportunities after its relationship with SOS ceased. We address each in turn and find all lacking.

1.

PICA's main argument proceeds in three steps. First, SOS lacked the capacity to perform consulting-and-investigating, executive-protection, and secure-transport work before SOS hired PICA. Second, SOS used PICA to fill this gap. And third, SOS continued to provide these services after its relationship with PICA ended. Conclusion: SOS must have developed those capabilities by misappropriating PICA's inside information.

If SOS truly couldn't provide those services without PICA's know-how—and if SOS's services substantially resembled PICA's trade secrets—PICA might have a point. Treatises and courts interpreting the Uniform Trade Secrets Act agree that proof a defendant knew of the trade secret "together with substantial similarities between the parties' products or processes" may support an inference that the defendant used the trade secret. Restatement (Third) of Unfair

---

[1] The Ohio Supreme Court has yet to decide whether and how circumstantial evidence can support a trade secret misappropriation claim. But many other States and circuits have. And consistent with the Uniform Trade Secrets Act's goal of promoting uniformity across the states, the Ohio Supreme Court routinely considers how others have interpreted the Act. *See, e.g.*, *Al Minor & Assoc., Inc. v. Martin*, 881 N.E.2d 850, 853–54 (Ohio 2008); *State ex rel. Besser v. Ohio State Univ.*, 721 N.E.2d 1044, 1048–50 (Ohio 2000) (per curiam); *see also* Ohio Rev. Code § 1333.68. We do too when wagering an *Erie* guess. *See, e.g.*, *Stratienko*, 429 F.3d at 600; *Magnesium Mach., LLC v. Terves, LLC*, No. 20-3779, 2021 WL 5772533, at *5 (6th Cir. Dec. 6, 2021).

Competition § 40 cmt. c (Am. L. Inst. 1995) (March 2024 update); *accord* 4 Milgrim on Trade Secrets § 15.01(1) & n.32 (2023); *Stratienko*, 429 F.3d at 600–02. But broad similarities are not enough. In *Stratienko*, we explained that to support the inference of misappropriation, defendant's product or process must bear substantial similarities to plaintiff's *secret*, not plaintiff's product or process more generally. 429 F.3d at 600–02 ("Sufficient circumstantial evidence of use in trade-secret cases must demonstrate that . . . *the secret* and the defendant's design share similar features." (emphasis added)). That's for good reason. If general similarities were sufficient, then plaintiffs could prove misuse "in virtually every trade secret misappropriation claim in which there is evidence of disclosure." *Spear Mktg., Inc. v. BancorpSouth Bank*, 791 F.3d 586, 601–02 (5th Cir. 2015).

There's just one problem: PICA offered only conjectural evidence that SOS lacked the capacity to offer consulting-and-investigating, secure-transport, and executive-protection services without PICA's proprietary information. *See* Ohio Rev. Code § 1333.61(A), (B)(2) (noting a defendant doesn't misappropriate trade secrets when it developed the same information through proper means). At most, PICA points to its own executives' testimony that SOS focused primarily on providing security-guard protection before associating with PICA. But PICA itself has discounted and undermined this testimony, conceding at summary judgment that a non-negligible percentage of SOS's work before the acquisition talks was outside the security-guard protection realm. It similarly acknowledges on appeal that these additional services were merely not "at the core" of SOS's previous offerings. Appellant Br. 20, 28.

Consistent with these concessions, SOS introduced ample evidence that it didn't need PICA's proprietary information to develop comparable services. To be sure, the bulk of SOS's work—roughly eighty percent—was security guarding. But the remainder had long included

consulting and investigations, transportation, and executive protection. As SOS's CEO testified in his deposition, SOS began in 1969 as an investigations-and-guarding firm. Then SOS steadily expanded its menu of services over the next fifty years to include executive protection, consulting, and secure transport. In 2009, for example, the U.S. State Department awarded SOS a $10 million annual contract to provide investigating, executive protection, and on-site security for the Embassy and Consulates in Brazil. And to magnify its capacity to provide a full suite of security services, SOS acquired over a dozen smaller security firms and developed a global network of over one hundred subcontractors. Some even did the same work as PICA and in the same regions. Clearly, and as PICA appears to acknowledge, SOS had broad operational capacity long before PICA entered the picture.

Further, PICA hasn't shown the connection between SOS's services and PICA's trade secrets necessary to support an inference of misappropriation. It contends that, after the acquisition fell through, SOS offered the consulting-and-investigating, secure-transport, and executive-protection services that had been PICA's expertise. But the trade secrets PICA claims are more specific—the business models, know-how, and local connections PICA used to deliver those services. PICA cites no evidence on appeal, and cited none before the district court, that SOS did more than offer the same type of services PICA had in the same market. So, unless PICA's other buckets of circumstantial proof hold substantial evidence of misuse, its trade-secrets claim must fail.

2.

Next, PICA highlights the fact that two past PICA employees—Diaz and Sant'Anna—later worked for SOS. According to PICA, SOS poached these employees so the company could provide PICA's proprietary services without its help.

But this, too, fails to support PICA's misappropriation claim. Most obviously, Diaz joined SOS over a year *after* the companies parted ways and SOS allegedly developed its new operating capacities. Most importantly, PICA has never argued that its employment of Sant'Anna or Diaz is itself a trade secret. That substantially downshifts the probative value of PICA's employment evidence—in this case, all the way to neutral.

Of course, employees sometimes know their employer's trade secrets. And if PICA had shown that SOS developed novel operating capacities that only Sant'Anna or Diaz knew how to provide, then their employment could offer circumstantial support. *See Stratienko*, 429 F.3d at 600. By itself, however, the mere fact that one company hired another's employees can't carry a misappropriation claim to trial.

3.

Finally, PICA says it lost clients and business opportunities after cutting ties with SOS. To be sure, the Ohio Supreme Court has held that client lists can be trade secrets. *See Salemi v. Cleveland Metroparks*, 49 N.E.3d 1296, 1302 (Ohio 2016). But a company doesn't misappropriate another's client lists when it has developed the same contacts through legitimate means. *Id.*; Ohio Rev. Code § 1333.61(A), (B)(2); *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 805 F.3d 701, 704 (6th Cir. 2015). Here, everyone agrees SOS had preexisting relationships with every client that dropped PICA from its list of security providers—namely, Microsoft, Yves St. Laurent, and Bain. And nobody disputes that SOS properly developed these client relationships. Thus, the fact that PICA eventually lost these clients doesn't support the inference that SOS misappropriated PICA's client lists or any of its other trade secrets.

PICA also suggests SOS stole its "strategic business plan" to partner with AS Solutions then sell out to a larger private security company, Allied Universal. Appellant Br. 28. Business

plans can qualify as trade secrets. Ohio Rev. Code. § 1333.61(D). But SOS didn't steal this idea from PICA. For one, SOS worked with AS Solutions before SOS and PICA partnered. And long before the two firms worked together, SOS had been successfully acquiring companies on the road toward being bought out itself—just like countless other companies worldwide. For another, Allied Universal (and others) approached SOS, not the other way around.

Nor is PICA's post-SOS revenue decline indicative of misappropriation. Lost profits could provide circumstantial proof of misappropriation only when paired with evidence that SOS misused some trade secret. *Stratienko*, 429 F.3d at 600–02. And as explained throughout, PICA offers no such evidence.

4.

To summarize, PICA has produced enough evidence for a reasonable jury to find the following: since ending their business relationship, PICA lost clients and revenues, while SOS continued providing the same services to the same clients—only now with two former PICA employees. Even viewed in the light most favorable to PICA, that's not nearly enough to show that SOS misappropriated PICA's trade secrets.

To all this, PICA makes two counterarguments for the first time on appeal—one factual, the other legal. Both are too little, too late.

First, PICA cites a slew of record information that it didn't reference before the district court. We decline to consider this new information for the first time on appeal. *See Bormuth v. County of Jackson*, 870 F.3d 494, 499–500 (6th Cir. 2017) (en banc).

Second, PICA argues for the first time on appeal that misusing another's trade secrets isn't the only way a company can be liable for misappropriation. A plaintiff, says PICA, can also succeed on a trade secret claim by proving a defendant *acquired* the secrets through improper

means. That's correct as a legal matter. *See* Ohio Rev. Code § 1333.61(A), (B)(1); *State ex rel. Besser v. Ohio State Univ.*, 721 N.E.2d 1044, 1048 (Ohio 2000); 4 Milgrim on Trade Secrets § 15.01(1) (2023) ("[E]stablishing wrongful use can be dispensed with if the defendant can be shown to have *improperly* acquired plaintiff's trade secret."). But as the district court noted in its thoughtful opinion, PICA didn't pursue this theory of liability in its summary-judgment brief. So, like its new record citations, we decline to consider PICA's misappropriation-through-acquisition theory. *Novus Grp.*, 74 F.4th at 428.

PICA protests that it sprinkled suggestions throughout its brief that the acquisition negotiations were a "sham," and it claims this was enough to preserve the issue. But to preserve this theory on appeal, PICA needed to make a developed argument that was sufficient to apprise the district court and SOS of the "factual and legal bases" for its claim. *Com. L. Corp., P.C. v. FDIC.*, 777 F.3d 324, 327 n.1 (6th Cir. 2015). It didn't. And in any event, PICA's assertion that the acquisition negotiations were mere pretext is belied by the fact that SOS tendered—and PICA rejected—two offers. It would have been a curious gambit indeed for SOS to have paid roughly $4 million as part of a sham acquisition.

Because PICA hasn't introduced enough evidence to show that SOS improperly used its trade secrets, PICA's Ohio Uniform Trade Secrets Act claim fails as a matter of law.

B.

PICA also claims SOS violated its "Confidentiality and Non-Disclosure Agreement." *See* R. 66-1. The district court held that PICA had failed to produce sufficient evidence that SOS breached the contract. On appeal, PICA relies on the same arguments it made in support of its trade-secret-misappropriation claim. Because those arguments are unavailing, we also affirm summary judgment on PICA's contract claim.

C.

Finally, PICA challenges the dismissal of its *quantum-meruit* claim. A *quantum-meruit* action allows a party to recover a benefit he conferred upon another when it would be unjust to deny the party compensation. *Quantum Meruit*, Black's Law Dictionary (11th ed. 2019); *accord Akron Bar Ass'n v. Catanzarite*, 893 N.E.2d 835, 840 n.1 (Ohio 2008). To succeed on this claim, PICA must show that SOS "used and enjoyed" PICA's services and that SOS should've known PICA "expect[ed] to be paid" for those services. *Campanella v. Com. Exch. Bank*, 137 F.3d 885, 892 (6th Cir. 1998) (quoting *Sonkin & Melena Co., L.P.A. v. Zaransky*, 614 N.E.2d 807, 811–12 (Ohio Ct. App. 1992)).

PICA bases its argument on plans it drafted in anticipation of servicing SOS clients during the 2016 Olympics. Because SOS and PICA cut ties many months before the Olympics, SOS ended up using different subcontractors for the job. Yet PICA claims SOS still relied on PICA's plans for certain aspects of the Olympics work, such as PICA's price estimates for clients.

Even assuming SOS "used and enjoyed" PICA's work product, that's not enough to warrant a trial on its *quantum-meruit* claim. As the district court noted, PICA hasn't produced evidence that SOS should have known that PICA "expect[ed] to be paid" for its draft plans alone (as opposed to being paid for providing the services described in those plans). *Id.*; *cf. ConFold Pac., Inc. v. Polaris Indus., Inc.*, 433 F.3d 952, 957–58 (7th Cir. 2006) (Posner, J.). For instance, PICA hasn't shown that SOS paid for similar plans in the past (e.g., paid invoices), that the parties expected SOS to do so here (e.g., unpaid invoices, emails hammering out the rate), or that companies in the industry typically compensate subcontractors for draft plans alone. PICA doesn't challenge this portion of the district court's opinion in its opening brief, so it forfeited the argument on appeal. *See Scott v. First S. Nat'l Bank*, 936 F.3d 509, 522–23 (6th Cir. 2019).

In any event, PICA's evidence is insufficient. *See Grassi v. Grassi*, No. 20-3358, 2021 WL 3355475, at *5 (6th Cir. Aug. 3, 2021). The only indication PICA anticipated payment for its draft plans is the following line in its summary judgment brief: "[PICA] expect[ed] that it would be compensated for the services and work when SOS closed on the acquisition." R. 66, Pg. ID 503. But SOS and PICA never closed on the acquisition. Nor was either company expected to, as evidenced by PICA's rejection of two SOS bids. It's hard to imagine how SOS should have known PICA expected a payment that PICA itself believed was contingent on a condition that never occurred. After all, the roulette player who bets on black doesn't expect anything from the casino when the ball lands on red.

*    *    *

We affirm.